## 39097. BOTHWELL v. THE STATE.

MARSHALL, Presiding Justice.

This case is here on certiorari. *Bothwell v. State,* 163 Ga. App. 261 (293 SE2d 720) (1982). Presented for decision are questions concerning the use by law enforcement authorities of the so-called "drug courier profile," as well as their use of police dogs trained to detect the smell of certain drugs. Certiorari was granted because of the importance of these questions to both the enforcement of the criminal law and the safeguarding of interests protected by the Fourth Amendment. These are the facts of the case herein.

At approximately 9:00 a.m. on August 21, 1981, special DEA Agent Gerald Chapman was posted at Gate 821 at the Atlanta International Airport, awaiting the arrival of Delta Flight 1140 from

Fort Lauderdale, Florida. Present with him was DEA Agent Paul Markonni.

Chapman observed the defendant Bothwell deplane, approach a Delta gate agent, and ask about a connecting flight to Phoenix, Arizona. Chapman observed that the defendant had a revalidated ticket in the name of Michael Thomas, which he had paid for in cash and which had one baggage claim attached. Chapman proceeded to a Delta computer terminal, from which he determined that two reservations had been made in the name of Michael Thomas. A telephone number was given on only one of the reservations, and Chapman called that number but the person answering professed no knowledge of Thomas or the airline reservations.

Chapman then went to the waiting area where the defendant was sitting. He identified himself as a DEA agent, and he asked the defendant if he could speak with him for a few minutes. The defendant responded that he could. Chapman asked to see the defendant's airline ticket, and the defendant handed it to him. The defendant told Chapman that his name was Michael Thomas but that he did not have any identification. (At this point, Chapman testified, the defendant began to behave in a nervous manner and, as the interview progressed, he acted increasingly nervous.) The defendant stated that he lived in Phoenix, and he gave a telephone number for his residence. Agent Markonni then called this number, but the person answering the telephone denied that he knew any Michael Thomas or anything about the airline reservation.

Chapman then again informed the defendant that he and Markonni were narcotics agents, and he asked the defendant whether he would allow himself and his luggage to be searched for narcotics. The defendant responded that he would. The defendant's luggage was retrieved by Markonni, and Chapman suggested that they search the luggage in a nearby Delta office in order to avoid causing the defendant any public embarrassment. The defendant agreed.

A pat-down search of the defendant revealed no narcotics or drugs. Before the luggage was searched, the defendant withdrew his consent. At that point, the defendant was allowed to leave and he continued on his flight to Phoenix. The suitcase was detained, and an Atlanta police officer was contacted who came to the airport with a dog who had been trained to detect the presence of drugs through his sense of smell. By biting and scratching the suitcase, the dog indicated that there were drugs therein. A search warrant was then obtained for the suitcase. The search of the suitcase produced a plastic bag containing cocaine. A warrant was then issued for the defendant's arrest. He was arrested as he was deplaning in Phoenix, and it was determined that his name is Bothwell and not Thomas.

Agent Chapman testified that he decided to interview the defendant because he fit several aspects of the so-called drug courier profile, i.e., traveling alone, traveling from an identified source city, flying under a false name, carrying little or no luggage, purchasing an airline ticket with cash, acting very nervous, and giving false information to the airline. Chapman further testified that the total interview time of the defendant was between five and ten minutes and that he never touched the defendant except during the pat-down.

The trial court denied the defendant's motion to suppress the cocaine, and he was convicted of the felony offense of trafficking in cocaine and the misdemeanor offense of giving a false name to a law enforcement officer. On appeal, the Court of Appeals affirmed. We granted certiorari. For reasons which follow, we affirm.

1. "The seven primary characteristics [of the drug courier profile] are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itinerary, such as rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.

"The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities." United States v. Berry, 670 F2d 583, 599 (5th Cir. 1982).

"[C]ases involving the legality of stops, interrogations, and searches of suspected drug smugglers by law enforcement officers at airports . . . raise fundamental constitutional issues concerning the Fourth Amendment safeguards protecting individuals against unreasonable searches and seizures." Id., at p. 588. Accordingly, in Berry the former Fifth Circuit Court of Appeals, sitting en banc, has issued an opinion attempting to provide guidance in this difficult area.

2. Whether a given contact between the police and citizens constitutes a "seizure" within the meaning of the Fourth Amendment — and, if so, is "reasonable" — is determined by "balancing the government interest involved against the nature of the intrusion on the individual." United States v. Berry, supra, at p. 590. See United States v. Brignoni-Ponce, 422 U. S. 873 (95 SC 2574,

45 LE2d 607) (1975); Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). Here, the interest of the individual is the right embodied in the Fourth Amendment to be free from arbitrary interference by law enforcement authorities. The majestic purpose underlying this Fourth Amendment right is nothing less than the vouchsafement of our democratic form of government by insuring that it is not turned into a police state. Balanced against the interest of the individual is the very substantial interest of government in terminating the widespread and proliferating practice of trafficking in illegal drugs. "The toll on our society in lives made wretched, in costs to citizens, and in profits of gross size funnelled to the most odious criminals, is staggering." United States v. Berry, supra, at p. 594. It can also be noted that these exorbitant profits are used to facilitate trafficking in the drug through the bribery of public officials, and this corruption of public officials in itself poses a grave threat to society.

Using a balancing-of-interests test, the Supreme Court in Terry v. Ohio, supra, held that even though a police pat-down of a potentially dangerous individual may constitute a seizure within the meaning of the Fourth Amendment, it can be based on a showing of "reasonable suspicion" to believe that criminal activity is afoot rather than the more rigorous standard of "probable cause" to believe that a particular crime has been committed (the probable-cause standard being required for a full-blown arrest). See also Adams v. Williams, 407 U. S. 143 (92 SC 1921, 32 LE2d 612) (1972). On the other hand, it was held in Delaware v. Prouse, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979), that the stopping of automobiles on the highways at the unbridled discretion of law enforcement officials cannot be justified by the state's interest in promoting public safety on the roads.

Of course, the Fourth Amendment in no way prohibits voluntary interaction between citizens and police. Coolidge v. New Hampshire, 403 U. S. 443, 488 (91 SC 2022, 2049, 29 LE2d 564) (1971); Terry v. Ohio, supra. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U. S., supra, at p. 19, n. 16.

3. On two occasions, the United States Supreme Court has considered use of the drug courier profile as a basis for conducting a seizure of an individual and search for drugs.

In United States v. Mendenhall, 446 U. S. 544 (100 SC 1870, 64 LE2d 497) (1980), the defendant had been stopped by DEA agents because her behavior fit aspects of a drug courier profile. She was asked to consent to a search. She then began to disrobe and took packets containing heroin from her undergarments.

Two Justices of the United States Supreme Court concluded that there had not been a "seizure" of the defendant and that she had consented to the search. Three Justices opined that even if there had been a seizure it was justified by reasonable suspicion. Four Justices dissented on the ground that the defendant's conduct was insufficient to lead a police officer reasonably to conclude that criminal activity was afoot.

In Reid v. Georgia, 448 U. S. 438 (100 SC 2752, 65 LE2d 890) (1980), the Court in a per curiam opinion held that a DEA agent could not have reasonably suspected the defendant of wrongdoing based on the fact that his behavior fit the following aspects of the drug courier profile: (1) arrival at the Atlanta airport in the early morning hours from Fort Lauderdale, a principal place of origin for cocaine shipments; (2) the defendant and his companion appeared to be concealing the fact that they were traveling together; and (3) they had no luggage other than shoulder bags.

The Court noted that these circumstances describe a very large category of presumably innocent travelers who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. 448 U. S., at p. 441. Therefore, the judgment of the Court of Appeals of Georgia, holding that the stop of the defendant was a permissible Terry-type seizure, was reversed. Two Justices dissented on the ground that there had been no seizure of the defendant. Three Justices concurred, noting that the issue as to whether there had even been a seizure of the defendant remained an open question.

On remand, the Georgia Court of Appeals, without comment, affirmed the order of the trial court sustaining the defendant's motion to suppress. We granted certiorari and reversed the Court of Appeals, holding that there had been no seizure of the defendants under the facts of the case. *State v. Reid,* 247 Ga. 445 (276 SE2d 617) (1981).

4. In United States v. Berry, supra, p. 590, the federal Court of Appeals held that nothing in the Fourth Amendment prohibits police from approaching an individual in order to solicit his or her help in the apprehension of criminals. However, "[o]nce a stop has been held a seizure, it can be constitutional only if based upon reasonable suspicion." Id.

In Berry, the court held, in accordance with Mendenhall, that a stop by police of an individual suspected of drug trafficking does not become a seizure, thereby subject to the rigors of the Fourth Amendment, unless " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " Id., at p. 595. " 'Examples of circumstances that might

indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *State v. Reid,* 247 Ga., supra, at p. 449. As previously stated, a seizure can be justified only if it is based upon reasonable suspicion, and "[t]he Supreme Court has defined reasonable suspicion as 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant (an) intrusion.' " United States v. Berry, supra, at p. 598.

In accordance with Reid, the court in Berry held that "because most of the characteristics [of the drug courier profile] are applicable as much to innocent as to suspect individuals, the mechanistic use of the profile by the courts without examining the totality of the circumstances could result in blanket approval of police seizures of innocent citizens." Id., at p. 599.

However, this is not to say that the profile characteristics have no proper role in making the determination as to the existence of reasonable suspicion. The profile is a valuable administrative tool "in guiding law enforcement officers toward individuals on whom the officers should focus their attention in order to determine whether there is a basis for a specific and articulable suspicion that the particular individual is smuggling drugs." Id., at p. 600, n. 21.

Relying on Dunaway v. New York, 442 U. S. 200 (99 SC 2248, 60 LE2d 824) (1979), United States v. Hill, 626 F2d 429 (5th Cir. 1980), and United States v. McCaleb, 552 F2d 717 (6th Cir. 1977), the court in Berry further held that if an individual who has been seized is required, without his consent, to accompany the police from the airport concourse to an airport office, this is a full-blown arrest requiring probable cause rather than mere reasonable suspicion; however, consent to the search, if not a product of the illegal arrest, removes the taint of illegality arising therefrom. Berry, supra, at pp. 601, 602.

5. The facts in Berry were as follows: the defendants, Dudley Berry and Jessica Zabish, were observed by DEA agents deplaning from a flight from Miami to Atlanta. Both defendants appeared nervous, and one of the DEA agents was vaguely aware of having seen a photograph of Berry. When the DEA agents confronted Berry and Zabish outside the airport terminal and identified themselves, Zabish and Berry gave false names. Berry at first stated to one of the agents that he was traveling alone, but he later admitted that Zabish was traveling with him. When Berry produced identification with the

name Dudley Berry on it, the DEA agent recognized the name as that of a man for whom he had been told to watch.

When the defendants were asked to accompany the agents to a DEA office, Berry agreed. Once there, the defendants agreed to a search during the course of which cocaine was found hidden in a file shield inside a shaving bag in Berry's luggage. During a search by a female officer of Zabish's person, she tried to swallow a container of cocaine. They were then arrested.

The court in Berry found that the DEA agent's merely approaching Berry and asking to talk to him did not constitute a seizure. The court further found that by the time there was any "seizure" of Berry, the DEA agents knew that the defendants matched some characteristics of the drug courier profile, were trying to hide their joint travels, and were traveling under aliases. One of the DEA agents had also been told to watch for a drug smuggler named Dudley Berry. The court found that the foregoing factors could serve as the basis for reasonable suspicion focused on Berry that would justify a seizure. Critical to this finding was the fact that Berry had misled the DEA agent concerning his traveling companion and concerning his true identity.

The Berry court agreed with the magistrate's finding that the defendants did not voluntarily accompany the DEA agents to the DEA office, and the court held that this was an arrest rather than a mere seizure. Although the court indicated that the defendants' giving of false names to the DEA agents (a misdemeanor under OCGA § 16-10-25) (Code Ann. § 26-2506) would constitute probable cause for the arrest, the court decided the case on the ground that the defendants' voluntary consent to the search removed the taint of any illegality concerning the arrest. Critical to this finding was the fact that the defendants had been told that they were free to refuse consent to a search and that they could consult with an attorney; in addition, they were allowed to consult with each other and were offered the use of a telephone.

6. The former Fifth Circuit Court of Appeals has also held that a law enforcement officer may use a canine trained in drug detection to sniff luggage in the custody of a common carrier; that the passenger who owns the luggage and has turned it over to the airline has no reasonable expectation of privacy in the air space surrounding the luggage; and that the use of a canine's enhanced olfactory sense to sniff for the presence of controlled substances in the luggage without opening the luggage does not constitute a search within the meaning of the Fourth Amendment. United States v. Goldstein, 635 F2d 356 (5th Cir. 1981) and cits.

In Goldstein, DEA agents posted at the Orlando International

Airport became suspicious of the defendants and examined the luggage they had checked with the airlines. A police dog trained to detect the presence of cocaine, marijuana, and heroin reacted to the presence of drugs when the defendants' bags were placed before the dog. The defendant Goldstein refused to consent to a search of his luggage, and a search warrant was therefore obtained.

The Court of Appeals held that the DEA agents' decision to retrieve Goldstein's luggage from the air carrier and subject the luggage to a sniff by the police dog did not constitute a search or seizure under the Fourth Amendment. The Court of Appeals further held that "once [the dog] positively reacted to the presence of drugs in the Goldstein bag, that reaction along with the other facts present supplied the DEA agents with the requisite probable cause to seek a warrant in order to search the luggage and to arrest Kern and Goldstein." United States v. Goldstein, supra, 635 F2d at p. 362.

7. In the case before us, it is only necessary to hold, in accordance with Berry and Goldstein, that the police dog's positive reaction to the presence of drugs in the defendant's suitcase, along with the other facts present, supplied the DEA agents with requisite probable cause to seek a search warrant for the luggage.

In so holding, however, we do not mean to imply that the search of Bothwell's luggage would have been unauthorized absent the dog's reaction to the presence of the drugs. Here, Bothwell gave false information to the airline concerning his call-back telephone number, as well as false information to the DEA agent concerning the telephone number of his residence. These two factors, along with the other facts present, supplied the DEA agent with reasonable suspicion, or probable cause, to believe that Bothwell was transporting drugs.

*Judgment affirmed. All the Justices concur, except Hill, C. J., Smith and Bell, JJ., who dissent.*

DECIDED FEBRUARY 8, 1983 —
REHEARING DENIED FEBRUARY 22, 1983.

*Douglas N. Peters,* for appellant.

*Michael D. Anderson, William L. McKinnon, Jr., Assistant District Attorneys,* for appellee.

SMITH, Justice, dissenting.

Roderick Bothwell was convicted of trafficking in cocaine in violation of OCGA § 16-13-31 (Code Ann. § 79A-811) and sentenced to ten years imprisonment. On appeal he challenges the trial court's

denial of his motion to suppress approximately four ounces of cocaine which he contends was seized illegally by Drug Enforcement Agency officials at the Atlanta airport. Today's majority opinion concludes that appellant's providing of "false information to the airline concerning his call-back telephone number, as well as false information to the DEA agent concerning the telephone number of his residence . . . along with the other facts present" gave the agents sufficient cause to stop appellant, take him to a secluded airport office, interrogate him in the presence of three agents, escort him to his departing plane, and detain his suitcase for an hour so that a search could be made. Because I strongly disagree with the majority's approval of the use of the so-called "drug courier profile" as grounds for probable cause and believe that the officers' high-handed conduct in this case violated appellant's Fourth Amendment rights, I dissent.

On August 21, 1981, DEA agents Gerald Chapman and Paul Markonni observed the arrival at Atlanta International Airport of Delta Flight 1140 from Fort Lauderdale, Florida. Chapman and Markonni were dressed in street clothes. Appellant, who was one of some two hundred passengers aboard the flight, deplaned at approximately 9:00 a.m. Appellant entered the airport concourse and approached a Delta employee to inquire about his connecting flight to Phoenix. Nothing in the record before us indicates that appellant's appearance or demeanor was unusual or "suspicious." Nonetheless, upon seeing him deplane, Agent Chapman chose to single out appellant for closer observation. From his vantage point behind the Delta gate agent, Chapman observed that appellant held a ticket for one Michael Thomas. The ticket had been purchased with cash, bore a revalidation stamp,[1] and had one baggage claim check attached. As appellant left his arrival gate and walked toward Gate 9 (the boarding area for his connecting flight), Chapman used a nearby Delta computer terminal to retrieve data on Flight 1140 reservations made in the name "Thomas." Two such reservations had been made. The first, made at 12:09 a.m. that day, included a telephone call-back number in southern Florida. Chapman called the number and spoke with a person who denied making a reservation and did not know anyone named Michael Thomas. It appears that Chapman made no follow-up calls concerning the first number nor did he attempt to

---

[1] The significance of the revalidation stamp is unclear. The presence of such a stamp simply means that the flight number had been changed or the ticket holder had changed flights since the original ticket purchase. Use of the stamp is a common airline practice as it eliminates the necessity of reissuing an entire ticket after a change of travel plans. The writer has done this many times.

verify this information in any manner. The second reservation, made at 6:35 a.m. for the 7:00 a.m. flight, indicated no call-back number.

After conferring with Agent Markonni, Chapman decided to interrogate appellant concerning his possible involvement in illicit drug smuggling activities. Chapman later testified that his decision to stop appellant was based solely on appellant's conformance to several characteristics of an informal drug courier profile maintained by Atlanta DEA agents. Appellant's behavior to this point matched the following profile characteristics: (1) traveling alone; (2) traveling from a drug source city; (3) ticket purchased with cash; (4) little or no luggage; and (5) possibly supplying false information to the airline.[2] Chapman and Markonni approached appellant, who was seated in a waiting area reading a magazine, and identified themselves as narcotics agents. At Chapman's request appellant handed his ticket folio, containing a boarding pass and baggage claim check, to the agents. They inquired about appellant's identity and travel plans. Appellant gave his name as Michael Thomas, but was unable to produce any identification. After *repeated* questioning, appellant supplied the agents with a Phoenix telephone number, saying that someone there could confirm his name and address. Markonni called the number, but the person answering the call was unable to identify appellant. Again, no verification was attempted. Appellant advised the agents to call back and inquire if anyone there knew "Hot Rod," as this was his nickname. The agents were by now convinced that appellant was lying about his true identity and refused to make a second call.

Markonni and Chapman again identified themselves as federal narcotics agents and asked appellant if he was carrying narcotics, either on his person or in his luggage. Appellant, described by Chapman as "extremely nervous" at this point, denied having any drugs. The agents asked if they could search appellant and his bag, and appellant agreed. Markonni, who had apparently retained appellant's boarding pass,[3] left to retrieve appellant's suitcase from a baggage holding area. At Agent Chapman's direction, Chapman and

---

[2] Because only one of the reservations for "Michael Thomas" indicated a call-back number, Agent Chapman could not be certain that appellant was the person who supplied the false call-back number. Nor did the agent make any effort to ascertain if there were two Michael Thomases on board Flight 1140 that day.

[3] Thus it appears that from the moment he deplaned in Atlanta until he departed for Phoenix, appellant was deprived of his freedom of movement in a significant manner by Agents Markonni and Chapman and was, for all practical and legal purposes, placed under arrest from the time he surrendered his airplane ticket until deposited at the departure gate.

appellant walked across the hall to a small Delta office for the purpose of conducting a search. They were joined there by Markonni, who now carried appellant's green hard-shell suitcase, and Agent Jim Burkhalter, a third DEA agent assigned to the airport. Appellant identified the bag as his. Inside the office, Agent Chapman *for the first time* informed appellant that he had a right to refuse to allow a search of himself and his personal effects. Thus informed, appellant stated that while he didn't object to a search of his person, he had changed his mind and would no longer consent to a search of his bag. Chapman conducted a brief pat-down search of appellant which revealed no weapons or contraband. (A weapons pat-down was not necessary as appellant had passed through airline detection points which would have revealed the presence of a gun.) The agents again requested permission to search the suitcase, commenting that appellant, who had previously denied having narcotics, should have nothing to hide; and promising that he "would be free to leave if he did not have any narcotics in his suitcase." Appellant again refused to allow a search of his suitcase. When appellant attempted to reclaim his bag, the agents informed him that he was free to go, but they were holding his suitcase in order to procure a warrant to search it for drugs. Appellant left, without his bag, to catch his connecting flight to Phoenix. He was escorted to his departure gate from the room where he had been held for questioning by Agents Markonni and Chapman. At the gate they made one final plea for permission to search his bag. Appellant declined the request and departed for Phoenix.[4]

Some time after appellant's flight lifted off,[5] the agents called in a specially trained narcotics dog to "sniff-search" appellant's

---

[4] Nothing in the record indicates that appellant's ticket folio was ever returned to him. To the contrary, Agent Markonni's testimony at the suppression hearing supports an inference that he retained appellant's ticket in order to retrieve appellant's bag.

[5] The state had the burden of proving the legality of the search at appellant's suppression hearing. OCGA § 17-5-30(b) (Code Ann. § 27-313). But as I read the transcript of that hearing, the state failed to prove the exact chronology of the events surrounding the agents' stop of appellant and subsequent search of his bag. Agent Chapman testified at trial that appellant's interrogation lasted only "five or six minutes," in spite of the fact that he and Agent Markonni accompanied appellant continuously from the time he deplaned in Atlanta until he boarded his connecting flight. Delta records for August 21, 1981 indicate that appellant's stop-over time in Atlanta that day was 53 minutes.

Concerning the detention of appellant's suitcase, the narcotics dog's handler testified that he was called to the airport at "around nine or ten o'clock" that morning. Agent Chapman testified that a search warrant was obtained "about an hour" after appellant boarded his connecting flight to Phoenix.

suitcase.[6] The dog "alerted" to appellant's bag, indicating the presence of narcotics. A search warrant was obtained, the contraband seized, and appellant arrested as he deplaned in Phoenix.

The Fourth Amendment's proscription of unreasonable searches and seizures unquestionably was meant to protect ordinary citizens like appellant from arbitrary intrusions into their privacy and personal autonomy. The fundamental nature of the right in issue cannot be emphasized too strongly: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Union Pacific R. Co. v. Botsford, 141 U. S. 250, 251 (11 SC 1000, 35 LE 734) (1891). Georgia courts, too, have a proud history of zealously safeguarding precious constitutional rights. Long before the application of the Fourth Amendment exclusionary rule to the states, Chief Judge Benjamin Harvey Hill, Jr., in *Underwood v. State,* 13 Ga. App. 206, 213 (78 SE 1103) (1913), had this to say with regard to the Fourth and Fifth Amendments to the U. S. Constitution: "The two provisions of the constitution which we have been discussing appear in the fundamental law of every State of this Union, as well as in the Federal constitution. They are the sacred civil jewels which have come down to us from an English ancestry, forced from the unwilling hand of tyranny by the apostles of personal liberty and personal security. They are hallowed by the blood of a thousand struggles, and were stored away for safe-keeping in the casket of the constitution. It is infidelity to forget them; it is sacrilege to disregard them; it is despotic to trample upon them. They are given as a sacred trust into the keeping of the courts, who should with sleepless vigilance guard these priceless gifts of a free government. We hear and read much of the lawlessness of the people. One of the most dangerous manifestations of this evil is the lawlessness of the ministers of the law. This court knows and fully appreciates the delicate and difficult task of those who are charged with the duty of detecting crime and apprehending criminals, and it will uphold them in the most vigilant legal discharge of all their duties, but it utterly repudiates the doctrine that these important duties can not be successfully performed without the use of illegal and despotic measures. It is not

---

[6] That the agents felt compelled to summon a specially trained narcotics dog is somewhat surprising, considering Markonni's and Chapman's own remarkable olfactory powers. See *Brooker v. State,* 164 Ga. App. 775 (298 SE2d 48) (1982), cert. denied Jan. 26, 1983 (Smith and Bell, JJ., dissenting); *Berry v. State,* 163 Ga. App. 705 (294 SE2d 562) (1982), cert. denied Nov. 12, 1982 (Smith, J., dissenting).

true that in the effort to detect crime and to punish the criminal, 'the end justifies the means.' This is especially not true when the means adopted are violative of the very essence of constitutional free government. Neither the liberty of the citizen nor the sanctity of his home should be invaded without legal warrant. Suspicion is no substitute for a legal warrant, and the badge of authority is the emblem of law and order and gives no right to the wearer to arrest without warrant, imprison without authority, and torture without mercy."

The United States Supreme Court and this court have consistently imposed a standard of "reasonableness" when reviewing the actions of law enforcement officials, judging the permissibility of a particular law enforcement practice by balancing its intrusion on an individual's Fourth Amendment rights against its promotion of legitimate governmental interests. See Delaware v. Prouse, 440 U. S. 648, 654 (99 SC 1391, 59 LE2d 660) (1978). Stated simply, this reasonableness test means that probable cause must be present prior to an arrest or seizure of property by police. "Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.' " Dunaway v. New York, 442 U. S. 200, 213 (99 SC 2248, 60 LE2d 824) (1979). Probable cause exists only where, based on objective facts and circumstances, a man of reasonable caution would believe that a crime has been or is being committed. Brinegar v. United States, 338 U. S. 160, 175-76 (69 SC 1302, 93 LE 1879) (1949). A limited exception to the probable cause requirement was announced in Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), where the Supreme Court permitted a brief "stop and frisk" of a suspect by police on less than probable cause where the officers possessed sufficient articulable facts to justify a reasonable suspicion that the person stopped was engaged in crime and might be armed and dangerous. In Terry and subsequent cases the Court has reasoned that the public interest in preventing serious crimes, when balanced against the limited nature of the intrusion occasioned by a brief stop, justifies the application of a lesser standard than probable cause in investigative stop cases. The Terry "reasonable suspicion" standard was extended to purely investigative stops in Adams v. Williams, 407 U. S. 143 (92 SC 1921, 32 LE2d 612) (1972), and has been rightfully applied in the context of airport stops by numerous federal appeals courts and by our own Court of Appeals. See *Bowers v. State,* 151 Ga. App. 46 (258 SE2d 623) (1979), affirmed, 245 Ga. 367 (265 SE2d 57) (1980). To hold otherwise is to say that Terry applies

only to searches conducted on the streets. This is clearly not the case. Just as Terry's "reasonable suspicion" standard applies when one steps off the street into his automobile, Delaware v. Prouse, supra, Terry applies when one steps off an airplane onto the concourse of an airport. One does not abandon all expectation of privacy merely because he chooses to travel by air, rather than by foot or in an automobile.

In light of these well-established principles, the basic questions presented by this appeal are whether the DEA agents "seized" appellant and/or his luggage in a Fourth Amendment sense; and, if so, whether the seizure and search that followed were reasonable (that is, supported by reasonable suspicion if a Terry-type stop, or supported by probable cause if a full-blown arrest or seizure).

Clearly appellant was "seized" in the sense of a Terry stop when, during his exchange with Chapman and Markonni in the airport concourse, Agent Chapman demanded and received appellant's plane ticket. Up to this point, the brief interrogation of appellant can fairly be characterized as "voluntary interaction between citizens and police."[7] But when Chapman took appellant's ticket and Markonni retained it in order to retrieve appellant's bag, appellant was no longer free to continue on his way, and a seizure had occurred. See United States v. Elmore, 595 F2d 1036, 1042 (5th Cir. 1979); Bowers v. State, supra. " 'Whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person' . . . and the Fourth Amendment requires that the seizure be 'reasonable.' " United States v. Brignoni-Ponce, 422 U. S. 873, 878 (95 SC 2574, 45 LE2d 607) (1975). Thus in this case the government bears the burden of showing that, at the time of the initial stop,[8] Markonni and Chapman possessed "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] [an] intrusion." Terry v. Ohio, supra, at 21. The government has proven that at the time of the seizure, the agents knew the following facts about appellant: (1) he traveled alone; (2) he traveled from an identified drug source city; (3) his ticket was purchased with cash and bore a revalidation stamp; (4) he had one bag; and (5) he may have given the airline a false call-back number.[9]

---

[7] At least one federal court has held that a "seizure" occurs the instant an agent, relying on a drug courier profile, approaches an individual for questioning. See United States v. Rico, 594 F2d 320 (2d Cir. 1979).

[8] "Reasonable suspicion" must be determined at the time of the seizure, not with the benefit of hindsight. For this reason, the agents' later observation of appellant's nervousness, as well as appellant's supplying a false Phoenix telephone number, does not enter into my "reasonable suspicion" analysis.

[9] See n. 2, supra.

Do these facts, taken together and evaluated in the light of Agent Markonni's and Chapman's expertise and experience as drug investigators, constitute "reasonable suspicion" of criminal activity? I think not.

Of the five profile characteristics articulated by Agent Chapman, four are entirely consistent with innocence and are, in my view, of very little aid in evaluating the existence of reasonable suspicion for a Terry stop. Nor am I alone in my mistrust of drug courier profiles. Appellate court reliance on the profile in evaluating the constitutionality of an airport stop is an unacceptable practice. This much is clear from a close examination of Reid v. Georgia, 448 U. S. 438 (100 SC 2752, 65 LE2d 890) (1980) (per curiam), and United States v. Berry, 670 F2d 583 (5th Cir. 1982), both of which are cited extensively in the majority opinion. In Reid, a majority of the Supreme Court agreed that the defendant's conformance to four characteristics of a drug courier profile did not establish reasonable suspicion that he was engaged in criminal activity. The four characteristics relied on by the government in Reid (arrival from a source city; arrival in the early morning, when law enforcement activity is diminished; carrying little or no luggage; and trying to conceal the fact of traveling with a companion) are similar to the profile characteristics relied on in this case. The Court held, as a matter of law, that the agent could not have reasonably suspected Reid of criminal activity based on these observations, noting that the first three characteristics "describe a very large [number] of presumably innocent travelers, who would be subject to virtually random seizures were the court to conclude that as little foundation as there was in this case could justify a seizure." Id. at 441. Likewise, in Berry the former Fifth Circuit Court of Appeals expressed distrust of the use of drug courier profiles in assessing reasonable suspicion. Following a comprehensive review of the use of the profile in airport cases, the court held: "We use the opportunity presented by the occasion of this en banc sitting to consider the proper role of the profile characteristics in a court's determination of the existence of reasonable suspicion. We conclude that the profile is nothing more than an administrative tool of the police. *The presence or absence of a particular characteristic on any particular profile is of no legal significance in the determination of reasonable suspicion.*" (Emphasis supplied.) 670 F2d at 600.[10] The court explained that a

---

[10] Although not mentioned in the majority opinion, the above quoted paragraph is a passage which the Berry court itself characterized as its "holding." 670 F2d at 600.

mechanical match between profile characteristics and characteristics exhibited by a particular defendant would never, in itself, establish reasonable suspicion; but that cases may arise in which certain profile characteristics would, under particular facts and in light of the officer's experience, support a finding of reasonable suspicion.

The reasons for judicial mistrust of the drug courier profile are numerous and, I believe, compelling. Because many of the profile characteristics (e.g., nervousness, arrival from a source city, little or no luggage, cash purchase of ticket) are equally applicable to innocent persons, use of the profile by reviewing courts could lead to approval of wholesale seizures of innocent citizens by police.[11] United States v. Berry, supra, at 599. The accuracy of the profile has never been empirically validated, United States v. Westerbann-Martinez, 435 FSupp. 690 (EDNY 1977), and profile characteristics appear to vary wildly from airport to airport and case to case, giving the profile a shifting, chameleon-like quality.[12] One DEA agent candidly admitted that the profile consists of anything that happens to arouse

---

Nor are Reid and Berry isolated instances of disapproval of drug courier profiles. All federal circuit courts which have addressed the issue have concluded that satisfaction of a number of drug courier profile characteristics does not, in and of itself, satisfy the Terry requirement of specific and articulable facts justifying a stop. See United States v. Rico, n. 7 supra; United States v. McCaleb, 552 F2d 717, 720 (6th Cir. 1977); United States v. Scott, 545 F2d 38, 40, n. 2 (8th Cir. 1976).

[11] For example, this writer is acquainted with a law professor of a well-known American university who has been stopped and questioned by drug agents a total of seventeen times in airports. During those seventeen stops, he has been informed that the agents' suspicions were aroused by the fact that he exited the airplane first, in the middle, and last. Each of these circumstances was, at one time, a "profile" characteristic.

[12] Compare the Atlanta profile used in this case with the following profiles: United States v. Rico, 594 F2d 320, 325 (2d Cir. 1979) (LaGuardia Airport, New York City) (profile factors: (1) carrying little baggage, (2) nervousness, (3) checking to see if being followed, (4) attempts to leave airport immediately, (5) unusual dress, (6) no tags on luggage, (7) attempts by individuals to conceal their traveling together); United States v. Ballard, 573 F2d 913, 914-15 (5th Cir. 1978) (New Orleans) (profile factors: (1) nervousness, (2) little or no luggage, (3) large amounts of cash in small bills, (4) unusual itinerary, (5) arriving from source city, (6) paying for ticket in small bills, (7) one-way ticket, (8) use of alias, (9) false telephone number on flight reservation, (10) placing call immediately on arrival, (11) travel by known trafficker); United States v. McCaleb, 552 F2d 717, 719-720 (6th Cir. 1977) (Detroit Airport) (profile factors: (1) buying ticket with small bills, (2) travel to or from drug centers in short time period, (3) empty suitcase or luggage, (4) nervousness, (5) use of alias); United States v. Craemer, 555 F2d 594, 595 (6th Cir. 1977) (Cleveland Airport) (profile factors: (1) purchase of round-trip ticket to and from drug distribution center, with short stay between flights, (2) purchase of tickets with small or large bills, (3) checking no luggage or empty bags, (4) use of aliases, (5) suspicious or nervous behavior).

his suspicions in a particular case. See United States v. Chamblis, 425 FSupp. 1330, 1333 (EDMich 1977). Little wonder, then, that courts are reluctant to ascribe legal significance to the ever-changing profile characteristics, or to accept as binding a profile which was developed by the very law enforcement officials whose actions the courts are charged to review. See Ringle, Searches & Seizures, Arrests & Confessions § 16.2 (f) (2d ed. 1981).

For these reasons, I think that we, like the court in United States v. Berry, supra, should attach "no legal significance" to the presence or absence of certain drug courier profile characteristics when assessing "reasonable suspicion" for an airport stop. Under the facts of this case, the only circumstance observed by Agents Chapman and Markonni consistent with wrongdoing was appellant's possibly supplying a false call-back number to the airline. In my view this behavior did not provide "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the intrusion of an airport stop. Terry v. Ohio, supra, at 21. Since the initial stop of appellant was illegal, his ensuing detention and the search of his luggage should have been suppressed as fruits of the illegal stop. See Wong Sun v. United States, 371 U. S. 471 (83 SC 407, 9 LE2d 441) (1963).

Even if the initial stop of appellant was justified, his continued detention and questioning in the airport office clearly exceeded the scope of the original Terry stop and became an illegal arrest not supported by probable cause. United States v. Terry, supra, condones only a very limited detention "reasonably related in scope to the justification for [its] initiation." United States v. Brignoni-Ponce, supra. "A composite picture emerges of the 'Terry-type' stop. It is a brief stop, limited in time to that minimally necessary to investigate the allegation invoking suspicion and limited in scope to identification, . . . a protective 'pat-down' of the outer surfaces of clothing for weapons if the officer has reasonable apprehension that the person is armed [and] dangerous, and limited questioning reasonably related to the circumstances that justified the initiation of the momentary stop." Radowick v. State, 145 Ga. App. 231, 237 (244 SE2d 346) (1978). When the agents took appellant to the private office, while retaining his boarding pass, the arrest was complete and probable cause was required to justify the detention. Bowers v. State, supra, at 48. The coercive atmosphere of the agents' interrogation of appellant supports the conclusion that an arrest occurred. Appellant was cut off from the outside world, surrounded by three officers, questioned at length, and told that he could leave if he had no narcotics in his bag (implying, of course, that he could not leave until he consented to a search of his bag). "Requiring an

individual to accompany police to an [airport] office indicates a detention for a time period longer than that permitted in a seizure; cuts the individual off from the outside world, without indication of when he might be allowed to leave; places him in unfamiliar surroundings; may subject him to increased implicit police pressure; and leaves him without third parties to confirm his story of events that may have occurred, should his story differ from that of police. Such a detention . . . we believe is only constitutional if accompanied by probable cause." United States v. Berry, supra, at 602. Cf. Dunaway v. New York, supra; *State v. Smith,* 164 Ga. App. 142 (296 SE2d 141) (1982). No such probable cause existed here. The agents' information regarding a false call-back number and possible use of an alias, together with the other facts present, did not justify in a man of reasonable caution the belief that appellant was transporting drugs. Appellant's continued detention in the Delta office exceeded the scope of the initial stop without probable cause for doing so, and was illegal.

An independent ground for holding that the cocaine seized from appellant's bag should have been suppressed is that the continued detention of appellant's luggage was itself unconstitutional. The record indicates that police held appellant's bag for almost an hour[13] before the narcotics dog arrived and "alerted" to it, arguably establishing probable cause for the suitcase's continued detention and eventual search. Appellant did not relinquish his expectation of privacy in the bag's contents merely by depositing it in the airport baggage system. Moreover, when Markonni delivered appellant's bag to him, he placed the bag in appellant's possession. In so doing, he restored appellant's full expectation of privacy as the bag was no longer out of appellant's sight and control. It is to be noted that, at the time of appellant's detention, no one smelled any odor of drugs emanating from the suitcase. Thus the agents illegally deprived appellant of his personal bag for an hour without his consent or probable cause to do so.

It is settled that appellant's suitcase, as "a repository for [his] personal effects," Arkansas v. Sanders, 442 U. S. 753, 762 (99 SC 2586, 61 LE2d 235) (1979), is entitled to no less Fourth Amendment protection than appellant's person. It cannot seriously be argued that police could have lawfully held appellant in the Delta office for an hour in order to subject him to a "sniff-search" for drugs without probable cause to detain him. Neither could the agents lawfully detain appellant's bag. "[T]he Fourth Amendment does not draw any

---

[13] See n. 5 supra.

distinction between an unlawful seizure of a person and the similar seizure of his property. In both cases there is an infringement of the person's freedom of action. Police custody of his person precludes him from freely moving about. Police custody of his baggage deprives him of the use of it and its contents. Both create uncertainty and anxiety on his part." United States v. Place, 660 F2d 44, 51 (2d Cir. 1981). In Place the court held a two-hour detention of luggage under circumstances similar to this case to be unreasonable and a violation of the owner's Fourth Amendment rights. See also United States v. Regan, 687 F2d 531 (1st Cir. 1982) (22-hour detention of suitcase unreasonable); *Radowick v. State,* supra, (holding individual in patrol car for 40 minutes illegal where no probable cause); United States v. Chamberlin, 609 F2d 1318 (9th Cir. 1979) (20-minute detention). The continued detention of appellant's bag cannot, I believe, be termed "reasonable" under applicable standards.[14]

I would therefore reverse the trial court's denial of appellant's motion to suppress. While the societal toll exacted by widespread trafficking in illegal drugs is indeed great, this court cannot solve that problem by abdicating its role as the guardian of citizens' constitutional rights and countenancing illegal police tactics such as those employed in this case. As was said in Delaware v. Prouse, supra, one does not forfeit his Fourth Amendment rights when he steps off the sidewalk into his automobile. By the same token, one does not forfeit his Fourth Amendment rights when he steps off an airplane onto an airport concourse. "To allow such would be to encourage the development of a police practice of searching homes as well as individuals because they fit a profile. This case presents but another attempt to substitute some word or practice to circumvent the probable cause requirement of the Fourth Amendment. The court realizes that crime is rising, but some way can and must be found to combat it without destroying the constitutional rights of law-abiding citizens. The Constitution and laws were and are fashioned to protect the innocent and, in the process of so doing, to ferret out the guilty. To allow the police action here advocated by the state would be to deny every American citizen's constitutional right of privacy." *Bowers v. State,* 151 Ga. App. 46, 54 (258 SE2d 623) (1979) (Smith, J.).

I am authorized to state that Chief Justice Hill and Justice Bell

---

[14] United States v. Goldstein, 635 F2d 356 (5th Cir. 1981), relied upon by the majority, is distinguishable. In that case police maintained a narcotics dog at the airport so that no continuing detention of the defendant's bag (with accompanying anxiety, restriction of movement, and inconvenience) occurred.

join in this dissent.