## A90A1626. JAMISON v. THE STATE.
(405 SE2d 82)

McMURRAY, Presiding Judge.

Defendant filed a motion to suppress after he was indicted for the offense of trafficking in cocaine. The evidence adduced at a hearing on the motion to suppress revealed the following:

On September 5, 1989, Agent Terrell Toles, an experienced law enforcement officer assigned to the Drug Enforcement Administration Task Force ("DEA"), and DEA Agents "Souza and Barnes" were on duty at Atlanta's Hartsfield International Airport, monitoring "inbound and outbound flights looking for either drugs or contraband or money derived from drugs and contraband going through the airport." The agents were wearing casual clothing ("jeans, tennis shoes, a tee shirt") and they displayed no weapons. At about 7:45 that morn-

---

[2] See in this regard *Kirk v. State*, 194 Ga. App. 801, 802 (392 SE2d 249) (1990).

ing Agent Toles observed defendant and Karl Jamison deplane a flight from Miami, Florida, a "major drug source [city]." Agent Toles noticed defendant and Karl Jamison because they were wearing clothing commonly used by drug traffickers to conceal contraband on their bodies, i.e., "baggy clothes, baggy jean type pants and baggy loose fitting shirts with the shirttails hanging out over the crotch area." Agent Toles overheard either defendant or Karl Jamison "ask for connecting flight information to Columbia, South Carolina." He then watched the men walking towards the area of their connecting flight. Agent Toles went to an airline's computer and "brought up a reservation record for [defendant and Karl Jamison] and . . . discovered . . . that they were both paid for with cash and that they were both one way reservations. [He also discovered that there] was no telephone call back listed on the reservation record [and that] the reservations had been made just a few hours prior to the flight's departure from Miami." This information aroused Agent Toles' suspicion because drug couriers most commonly make one-way flight reservations a few hours before departure, they generally leave no telephone call back number and they most often complete the transactions with cash. This method of travel makes drug traffickers less "traceable . . ." and enables them to be available upon a moment's notice to "complete their drug transaction."

Agent Toles informed Agents Souza and Barnes "as to what [he] found out from the computer record and [he] informed them that [he] was going to attempt to interview [the suspects]." The agents went to the area of Karl Jamison's and defendant's connecting flight and they "spotted the [suspects] as they were walking down B Concourse towards the gate that they were to depart from." The agents approached defendant and Karl Jamison "[f]rom the front" and, as they "got close to them[, the suspects] walked inside the men's rest room." Agent Toles followed them into the rest room and observed Karl Jamison "at one of the urinals . . . and . . . watched [defendant] enter one of the stalls on the other side of the rest room." Agent Toles went inside a nearby bathroom stall so that he could "hear anything that [defendant] might be doing. . . ." The agent did not notice any sounds from defendant's stall that were consistent with the use of rest room facilities and this led him to suspect that defendant entered the stall in order to check "himself to make sure that if he was concealing anything inside his clothes that it was straight and secure and wouldn't fall out of his pants. . . ."

Agent Toles exited the rest room and informed Agents Souza and Barnes of the suspects' activities. "A couple of seconds later[, defendant and Karl Jamison] walked outside of the rest room and proceeded down the concourse towards their gate again." The agents then "walked up along side [the suspects] and [Agent Toles] displayed

[his] credentials to [defendant] and said, excuse, me, . . . I [am] a police officer and [then] asked [defendant] if [he] could speak to him for a second." Defendant "stopped and indicated that it was okay for [Agent Toles] to speak to him." Agent Toles "asked [defendant] if [he] could see his airline ticket and [defendant] pointed towards Karl [Jamison] and said, he has my ticket. . . . Karl [Jamison then handed] a Delta [Airline] ticket envelope to Agent Souza. Inside that ticket envelope was [defendant's] ticket. [Agent Toles] then said to Karl [Jamison], is it okay if I look at your ticket and he said, yes, it was and [Agent] Souza handed the envelope and all the contents to [Agent Toles]." Agent Toles inspected the airline tickets and confirmed the information he had obtained from the airline's reservation computer. However, he also learned "that there was one baggage claim check stub attached to the ticket envelope indicating that there was just one piece of checked luggage between the two of them." Agent Toles recognized this as another drug courier characteristic, i.e., the suspects were traveling light so as to be responsive to the last minute and unpredictable nature of the drug distribution business.

Agent Toles returned the tickets to the suspects and asked them "if they had any form of identification that [he] could look at." Defendant and Karl Jamison produced their South Carolina driver's licenses and, after inspecting the identification and returning it to the suspects, Agent Toles explained to the Jamisons that he and the other agents were "narcotics agents and [informed the suspects] that [they] were looking for drugs and narcotics and the proceeds of those coming through the airport. . . ." At that point, defendant "became extremely nervous and fidgety. His breathing was real panted, his hands were quivering and he moved around from one spot to the next. Not a long way away, but just fidgeting back and forth from foot to foot." Agent Toles noticed defendant's changed behavior and was aware that "[e]verytime [he had] interviewed a drug courier that was in the process of couriering drugs [that the courier] got nervous."

Agent Toles then "asked [the suspects] if it would be okay if [he or the other agents] could search them and their one piece of checked luggage. . . ." Defendant's nervous demeanor became even more pronounced and Karl Jamison "quickly spoke up and said, I don't care if you search the suitcase, but I don't want you to search us." Agent Toles "asked him, do you have a problem being searched and . . . indicated that it's just a quick pat of [the] body and [that the agents] can do it in private so that nobody will see it." Defendant "then said to [Agent Toles], no, the suitcase is okay, but not us." Agent Toles said "[t]here [is] a hallway just to the right, . . . a small cove-way that leads to a jetway. [He] then pointed to this cove-way . . . and . . . said, it's really no big thing, guys, we could go right over there and do it real fast. . . ."

Defendant was getting "ready to leave [as Agent Toles] was talking [and, in the middle of the conversation, defendant] quickly jumped to his right and took off running up the concourse away from the direction that [the suspects] had been walking toward their gate. [Agent Toles] ran a few steps behind [defendant] and tackled him. . . ." Defendant was then subdued and Agent Toles searched defendant "and felt several hard, unnatural bulges around [defendant's] groin and crotch area." Defendant was then placed under arrest and taken into police custody. The objects found in defendant's "crotch area" were identified as "[a]bout 2.2 pounds" of cocaine.

After the close of evidence, the trial court found probable cause for defendant's arrest and search and specifically cited defendant's flight from the law enforcement officers. Nonetheless, defense counsel pressed defendant's version of the events leading to the search and arrest, but the trial judge stated that he didn't "believe a thing [that] either [defendant or Karl Jamison] said when they contradicted the officer" and held that "it ripened into probable cause at the moment [defendant] ran taking in all the other facts and circumstances."

Defendant's motion to suppress was denied. The case was then tried before the trial court, without a jury, and defendant was found guilty of the offense charged. Defendant now appeals and contends the trial court erred in denying his motion to suppress. *Held:*

"Theoretically, there are at least three kinds of police-citizen encounters: verbal encounters involving no coercion or detention [which do not invoke the Fourth Amendment]; brief 'stops' or 'seizures' which must be accompanied by a reasonable suspicion; and 'arrests' which must be supported by probable cause. *McAdoo v. State*, 164 Ga. App. 23, 26 (295 SE2d 114), citing *United States v. Berry*, 670 F2d 583, 591 (5th Cir. 1982)." *Verhoeff v. State*, 184 Ga. App. 501, 502 (2), 503 (362 SE2d 85).

In the case sub judice, defendant argues the DEA agents did not have reasonable suspicion to make the initial encounter; that he was taken into police custody (arrested) without probable cause when Agent Toles "pointed to a coveway and with his hand on [defendant's] shirt told [defendant and Karl Jamison that] they could go right over there and do [a search] real fast" and that defendant's flight was insufficient to support probable cause for his search and arrest. Any challenge to the trial court's finding that probable cause existed for defendant's arrest, utilizing defendant's version of the events leading to his arrest and reasoning that defendant's "behavior in taking two running steps [does not evidence] the sort of consciousness of guilt to justify characterizing his behavior as 'flight' " is illogical. Defendant's arguments are supported only by his version of the events leading to his arrest and it would be illogical to ignore the trial court's role as factfinder and to discount direct testimony supporting

the trial court's finding that probable cause existed for defendant's search.

"On motion to suppress evidence, the trial judge sits as the trior of facts, hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. *West v. West*, 228 Ga. 397, 398 (185 SE2d 763)." *State v. Swift*, 232 Ga. 535 (1), 536 (207 SE2d 459). See *Santone v. State*, 187 Ga. App. 789 (1), 790 (371 SE2d 428); *Jones v. State*, 184 Ga. App. 328 (361 SE2d 693); and *State v. Peacock*, 178 Ga. App. 96, 97 (342 SE2d 364).

In the case sub judice, the DEA agents' initial encounter with defendant did not amount to a brief "stop" or "seizure" which required reasonable suspicion. "[A]irport stops of individuals by police, if of extremely restricted scope and conducted in a completely noncoercive manner, do not invoke the Fourth Amendment." *United States v. Berry*, 670 F2d 583, 594, supra. Agent Toles testified that the DEA agents were dressed casually and that their weapons were not displayed on the morning that they approached defendant and Karl Jamison. He further testified that the encounter with defendant and Karl Jamison was of "a conversational tone . . ."; that the conversation was not threatening or coercive; that neither defendant nor Karl Jamison attempted to terminate the conversation; that the suspects did not indicate that they did not wish to talk to the agents; that the suspects did not attempt to leave before defendant "quickly jumped up . . ." and ran and that nothing was done "to objectively manifest [to the suspects that they] weren't free to leave." This testimony and testimony showing the consensual nature in which defendant and Karl Jamison submitted to Agent Toles' questioning was sufficient to authorize a finding that defendant was free to leave throughout the encounter with the DEA agents and that defendant's Fourth Amendment rights were not then violated. See *Calixte v. State*, 197 Ga. App. 723 (2) (399 SE2d 490), and *Verhoeff v. State*, 184 Ga. App. 501, 502 (2), supra. Further, we agree with the trial court that "it ripened into probable cause at the moment [defendant] ran taking in all the other facts and circumstances." The evidence which supports this finding is Agent Toles' testimony that defendant exhibited several characteristics of a typical drug courier; that defendant exhibited untypical behavior inside a public rest room; that defendant displayed anxiety upon learning that the DEA agents were drug enforcement officers, i.e., defendant became "fidgety[, his] breathing was real panted, his hands were quivering and he moved around from one spot to the next[,] back and forth from foot to foot" and that defendant "quickly jumped to the right and took off running . . ." in a direction inconsistent with defendant's connecting flight while Agent Toles was talking to defendant and Karl Jamison about

how a consensual search could be performed. Consequently, the trial court did not err in denying defendant's motion to suppress. See *Travis v. State*, 192 Ga. App. 695, 696 (385 SE2d 779).

*Judgment affirmed. Banke, P. J., Birdsong, P. J., Pope, Beasley and Andrews, JJ., concur. Sognier, C. J., Carley and Cooper, JJ., dissent.*

SOGNIER, Chief Judge, dissenting.

I dissent because the arrest of Marvin Keith Jamison was without probable cause and therefore his motion to suppress should have been granted. This court has addressed the effect of flight on probable cause to arrest in the context of airport stops. See *Brown v. State*, 188 Ga. App. 417 (373 SE2d 99) (1988) (defendant properly arrested when, after consenting to body search, he decided to call attorney first, walked nervously past telephones 20 to 30 yards away, was followed by agents from one airport concourse to another concourse, passing other telephones, before running from officers up an escalator) and *Banks v. State*, 187 Ga. App. 280, 281 (1) (370 SE2d 38) (1988) (after voluntarily disclaiming any ownership of totebag he was carrying, defendant first started to go with officers to discuss the matter then turned and bolted). See also *Brown v. State*, 190 Ga. App. 38 (378 SE2d 357) (1989) (defendant properly arrested as a party to the crime based on the behavior of defendant's travelling companion who assaulted a DEA agent and fled) and *State v. Reid*, 247 Ga. 445 (276 SE2d 617) (1981) (defendant consented to body search, then ran into parking lot, discarding bag with contraband 100 feet from place where apprehended). The facts of these cases are in marked contrast to the evidence adduced at the hearing on appellant's motion to suppress.

The transcript of the hearing establishes that appellant and his brother, Karl Jamison, were stopped by three DEA agents because the brothers exhibited several characteristics of the drug courier profile and because Agent Terrell Toles had not overheard appellant make any noise while inside an airport bathroom stall. It is uncontroverted that being stopped in the airport by three DEA agents did not unduly alarm appellant, who appeared "fairly calm" to Toles. It is also uncontroverted that both appellant and his brother cooperated fully with the agents, telling the agents their correct names, allowing the agents to inspect their airline tickets, which were in their correct names, and providing the agents, at the agents' requests, with South Carolina driver's licenses identifying them as the persons named on the tickets. The only additional piece of suspicious information raised by the stop was Toles' discovery that the two brothers had only one piece of checked baggage between them.

Toles admitted at the hearing that the stop of appellant and his brother demonstrated no irregularity, so he requested that the broth-

ers submit to a consensual search. Toles testified that Karl responded "quickly" that the agents could search the luggage but could not search them. Toles responded by asking if Karl had a problem being searched and indicated that it was "just a quick pat of your body and we can do it in private so that nobody will see it." After appellant, in turn, told Toles "no, the suitcase is okay, but not us," Toles nevertheless pointed to a small hallway to their right and said "it's really no big thing, guys, we could go right over there and do it real fast." It was during this conversation about searching appellant's person that Toles noticed that appellant had become extremely nervous and fidgety, shifting back and forth from foot to foot. Toles stated that up to the point where appellant refused a body search the agents had done nothing to manifest to the brothers that they were not free to leave and that the brothers had not indicated they wanted to end the conversation or tried to leave. However, as Toles was making his third request that the brothers submit to a body search, appellant "quickly jumped to his right and took off running up the concourse" in the direction of the rest room and away from his departure gate. Toles' own testimony established that the running involved was "[j]ust a couple of steps" before appellant was tackled and knocked cleanly to the floor. Appellant was then handcuffed and body searched, leading to the discovery of the contraband.

Toles testified, based on his experience, that the circumstances surrounding the stop of appellant did not present the DEA agents with an articulable suspicion that appellant was committing a crime until the moment appellant "broke and ran." The trial court denied appellant's motion because "taking in all the other facts and circumstances," Toles had an articulable suspicion which ripened into probable cause to arrest at the moment appellant ran.

"It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, [cit.], though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause — evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed, [cit.] — must be measured by the facts of the particular case. The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave lawabiding citizens at the mercy of the officers' whim or caprice.' [Footnote omitted; cit.]" *Wong Sun v. United States*, 371 U. S. 471, 479 (83 SC 407, 9 LE2d 441) (1963).

The law is clear that Toles and the other officers were entitled to detain appellant and his brother for the limited amount of time necessary to investigate the circumstances invoking suspicion, primarily the drug courier profile characteristics the brothers exhibited. How-

ever, because our courts have recognized that the drug courier profile is applicable as much to innocent as to suspect individuals, *Bothwell v. State,* 250 Ga. 573, 578 (300 SE2d 126) (1983); see also *Del Rio v. State,* 171 Ga. App. 381, 383 (1) (320 SE2d 236) (1984), the courts have restricted the scope of such a stop to obtaining identification and asking those questions reasonably related to the circumstances that justified the initiation of the momentary stop. *Pullano v. State,* 169 Ga. App. 377, 380 (312 SE2d 857) (1983). Here, appellant and his brother were stopped, the agents made their inquiries, appellant fully cooperated with the officers, and no irregularities were uncovered by the agents. Since it is well established that exhibition of certain characteristics listed on the drug courier profile does not automatically establish reasonable suspicion for an arrest, *United States v. Berry,* 670 F2d 583, 600 (5th Cir. 1982), followed in *Bothwell,* supra, as Agent Toles acknowledged in his testimony, an examination of those "other facts and circumstances" considered by the trial court reveals that they presented no legal basis for arresting appellant.

Turning to appellant's nervousness and foot shifting, stressed by the majority, since it is uncontroverted appellant was fairly calm up to the point Toles requested he voluntarily consent to a body search, and since Toles testified that Karl Jamison "quickly" declined Toles' request, it would appear that this suspicious nervousness arose only when Toles began making his repeated requests for the brothers to submit to a body search. It also appears that after having fully cooperated with Toles up to this point, appellant did not "break and run" until the explicit refusals by both appellant and his brother to consent to such a search had been ignored and Toles had indicated to appellant a nearby hallway where the body search could be conducted.

Since Toles testified that appellant was not in custody, that he had no reasonable basis to arrest appellant, and that he could not require appellant to submit to a body search, the inescapable conclusion is that from Toles' point of view, appellant was absolutely free to leave. As a result, there existed nothing from which Toles could have thought appellant was "breaking" when appellant "ran" two steps. "The term 'flight' signifies not merely a leaving, but a leaving . . . under a consciousness of guilt and for the purpose of evading arrest, and the mere going away from the scene of a crime is not always flight in the sense that evidence is thus furnished of a consciousness of guilt." 22A CJS Criminal Law, § 743. See, e.g., *Renner v. State,* 260 Ga. 515 (3) (a) (397 SE2d 683) (1990) (evidence indicated that defendant's departure "was occasioned by a consciousness of guilt"). The reasoning behind that definition likewise applies to the mere "going away from" the presence of a law enforcement officer. See *Richardson v. State,* 113 Ga. App. 163, 164 (2) (147 SE2d 653) (1966).

However, while flight, in connection with other circumstances, can constitute probable cause for arrest without a warrant, see *Green v. State*, 127 Ga. App. 713, 715 (194 SE2d 678) (1972), appellant's behavior in taking two running steps does not evidence the sort of consciousness of guilt to justify characterizing his behavior as "flight."

An explanation for appellant's behavior is presented not only on the basis that appellant, not being in custody, was legally free to depart at any time (and, arguably, in any manner) he chose, or on the fact that Toles' testimony, having established that from his point of view he believed appellant was free to depart, leaves uncontroverted appellant's testimony that his intent in moving from Toles was not to flee. The evidence adduced at the hearing also offers another explanation. It is based on Toles' testimony that after appellant and his brother had cooperated with the officer and after they had explicitly denied his requests made to each of them to allow him to search their bodies, an invasion of their privacy to which the brothers were not legally required to submit, Toles ignored their responses and persisted, even to the point of indicating to the brothers where the search could be conducted. It was at that point, according to Toles, that appellant "broke and ran." However, as with the fleeing defendant in *Wong Sun*, supra, appellant's flight of two steps signified a consciousness of guilt no more clearly than it did a natural desire to avoid the persistence of an officer who refused to take "no" for an answer.

Given the cooperation provided by appellant and his brother, their open acknowledgment of each other and their relationship, compare *Brown*, 190 Ga. App. at 39, the legal identification they produced, compare *Banks*, supra at 281 (1), and the lack of nervousness they displayed until Toles pressed for a body search, compare *Brown*, 188 Ga. App. at 417-418, appellant's two running steps from the non-custodial presence of an officer who would not accept appellant's refusal as an answer could not have warranted a man of reasonable caution in the belief that a felony had been committed. *Wong Sun*, supra at 479. "A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked. [Cit.]" Id. at 484. Therefore, I would reverse the trial court's denial of appellant's motion to suppress.

I am authorized to state that Judge Carley and Judge Cooper join in this dissent.

DECIDED MARCH 12, 1991 —
REHEARING DENIED MARCH 29, 1991 —

*William E. Frey*, for appellant.

*Robert E. Keller, District Attorney, Clifford A. Sticher, Assistant District Attorney,* for appellee.