## A90A1878. CALIXTE v. THE STATE.
### (399 SE2d 490)

BIRDSONG, Judge.

John Bonel Calixte a/k/a Joe Taylor appeals a bench trial judgment of conviction for trafficking in cocaine and the sentence. Appellant was searched at Hartsfield Atlanta International Airport and found to be carrying over 200 grams of 75 percent pure cocaine. He asserts two enumerations of error, the validity of which depends upon the legality of the search. *Held*:

1. A stipulation was entered regarding testimony introduced at the suppression motion hearing of appellant and a narcotics officer. Their testimony varies substantially regarding the conduct of the search. On appeal, evidence must be viewed in a light most favorable to the verdict, and appellant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. *Grant v. State*, 195 Ga. App. 463 (1) (393 SE2d 737).

2. The circumstances surrounding the search when viewed in a

light most favorable to the verdict reflect the following: Investigator Prattes, a female investigator who has over 15 years law enforcement experience, and a female GBI agent observed appellant deplane from an inbound flight from Miami at Hartsfield Atlanta International Airport. The two agents wore casual clothing and their weapons were concealed. Miami is a known drug source city. Appellant had an unkempt appearance and his shirt was hanging outside his trousers. It is not uncommon, in Prattes' experience, that a lot of drug traffickers who are carrying drugs on their body will wear either oversized shirts or shirts outside their trousers to conceal any apparent bulges. Appellant was carrying a small suitcase, and he "briskly" walked up the concourse. The two officers discussed appellant briefly and elected to follow him to observe his actions. Prattes observed appellant look over his left shoulder twice and then look over his right shoulder with a less obvious movement, as if he was looking to see if anyone was following him. The officers approached appellant from the rear; Prattes had her police credentials in her hand. She identified herself as a police officer, and asked if she could talk with appellant "for a minute." She repeated her request, and appellant "stopped on his own." Although Prattes did walk by appellant's side to show her badge, she did not walk in front of, stand in front of, or "put [her] hands on [appellant] until he gave [his] consent" to search. Appellant was not aware of the GBI agent behind him until after he stopped and put his bag down. Prattes asked appellant whether she could see his airline ticket; appellant initially produced only his boarding pass, but upon request gave the investigator his entire ticket envelope. Prattes noticed that there were no baggage claims attached to the ticket, the ticket was paid for with cash, and the ticket was for a one-way flight purchased that same day. Prattes considered this significant because drug traffickers do not carry excess baggage, and they do not check bags so that they can exit the airport as quickly as possible. Further, drug traffickers often travel on one-way tickets and occasionally on round-trip tickets with a quick turnaround flight time. Moreover, it is quite common for tickets purchased by drug traffickers to be issued the same day as the flight, as it is quite common for them to make last-minute reservations. Also, drug traffickers purchase a lot of the tickets for cash to preclude a tracing of a ticket to them. Appellant was asked and stated that the reason for his trip was to visit his sister for two or three weeks. Prattes found it unusual that he had such a small suitcase in which to carry clothes. After obtaining the ticket, Prattes asked appellant his name. He appeared to be "trying to read the name on the ticket," which led Prattes to believe appellant could not remember the name thereon. Appellant said his name was "John"; when asked his last name, appellant attempted to look at the ticket again and then replied, "Calixte." This was his true name, but

the ticket was issued in the name of "Joe Taylor." Traveling under another name is another drug courier characteristic. After being confronted with the discrepancy between the names, appellant asserted the ticket had been issued to his brother, Joe Taylor. At this point, Prattes observed appellant "was becoming visibly shaken" and seemed to be searching for answers. Due to appellant's nervousness and inconsistent answers, the investigator believed he was "lying." Appellant was asked to produce identification and, after flipping "back and forth" among cards in his wallet, he produced a Florida driver's license. Prattes told appellant the officers were narcotics agents and asked if he would "cooperate and allow me to search you and your bag. We could do it here or either go to a private area if you prefer." Appellant replied, "Well, okay, you can do it here if you want." Prattes responded that she would rather conduct the search in a private area away from the traffic, and as the three moved towards an alcove three to five feet away, Prattes dropped something. She bent over to retrieve the object and observed appellant "attempting to conceal" a "bulge" in his lower abdominal area. As soon as they entered the alcove area, Prattes asked appellant, "Is it still okay for me to search you?" and appellant again responded affirmatively by saying, "Yes." Prattes felt a "large, hard, unnatural bulge in [appellant's] groin area." She immediately stopped and placed appellant under arrest. Search of appellant then revealed cocaine taped to his underwear underneath a lady's panty girdle. Prattes testified appellant neither was threatened nor was he physically forced to do anything.

Appellant testified to a substantially different version of the events, claiming an officer got in front of him and stopped him and placed her hand upon him. He was ordered to show his ticket, and believed he had to do what the officers said. He did not want to be searched, and he did not voluntarily consent. Appellant made an admission in open court that he did not see the accompanying GBI agent until he set his bag down; and that the investigator asked him if he would consent to search his person and his bag, but that he said nothing in response to her questions either when first asked or later when asked in the side-room or alcove area.

"Theoretically, there are at least three kinds of police-citizen encounters: verbal encounters involving no coercion or detention; brief 'stops' or 'seizures' which must be accompanied by a reasonable suspicion; and 'arrests' which must be supported by probable cause. [Cits.]" *Verhoeff v. State*, 184 Ga. App. 501, 503 (2) (362 SE2d 85). In the denial of the suppression motion, *inherent* therein is the trial court's finding "that appellant's consent to search was made voluntarily." See *Garcia v. State*, 195 Ga. App. 635, 637 (1) (394 SE2d 542). Further, viewed in its entirety, the suppression motion hearing tran-

script independently "shows that [during the police-citizen encounter] appellant was not subjected to any duress or coercion, and that he freely, voluntarily and intelligently consented to the search of his person and his personal belongings." (Citations and punctuation omitted.) *Santone v. State*, 187 Ga. App. 789, 791 (1) (371 SE2d 428). "Once a voluntary consent is legally obtained, it continues until it either is revoked or withdrawn." *Mallarino v. State*, 190 Ga. App. 398, 403 (379 SE2d 210). Appellant never withdrew either of his voluntary consents.

"[A] police officer may in appropriate circumstances and in an appropriate manner [as done in this case] approach a person for purposes of investigating *possibly* criminal behavior even though there is no probable cause to make an arrest. It was this legitimate investigative function [the two officers were] discharging when [they] decided to approach petitioner. . . . [The investigator] had observed [appellant] go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." (Emphasis supplied.) *Terry v. Ohio*, 392 U. S. 1, 22 (88 SC 1868, 20 LE2d 889). "On the facts of this case [viewed in a light most favorable in support of the verdict] no 'seizure' of the [appellant] occurred. The events [of the police-citizen encounter] took place in the public concourse. The [female] agents wore no uniforms and displayed no weapons. They did not summon the [appellant] to their presence, but instead approached [him] and identified themselves as [law enforcement] agents. They requested, but did not demand to see the [appellant's] identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest." *United States v. Mendenhall*, 446 U. S. 544, 555 (100 SC 1870, 64 LE2d 497). According to the officers, appellant twice thereafter gave his voluntary consent to search before any search or seizure occurred. An individual may waive his Fourth Amendment rights by voluntarily consenting to a search; valid consent eliminates the need for both probable cause and a search warrant. *Walton v. State*, 194 Ga. App. 490, 492 (2) (390 SE2d 896).

Appellant's assertions of error regarding the denial of his suppression motion are all without merit; the search was reasonable and the seizure of drugs also was lawful.

3. Review of the transcript in a light most favorable to the jury's verdict reveals ample evidence from which any rational trier of fact could have found beyond a reasonable doubt that appellant was guilty of the offense of which he was found guilty. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560).

*Judgment affirmed. Banke, P. J., and Cooper, J., concur.*

DECIDED OCTOBER 22, 1990 —
REHEARING DENIED NOVEMBER 26, 1990.

*Paul S. Weiner*, for appellant.
*Robert E. Keller, District Attorney, Albert B. Collier, Assistant District Attorney*, for appellee.