## A95A1851. THE STATE v. CRISANTI.
### (470 SE2d 314)

BEASLEY, Chief Judge.

Edward Crisanti was indicted for possession of methamphetamine with intent to distribute in violation of the Georgia Controlled Substances Act. OCGA § 16-13-30 (b). The State appeals from the trial court's order granting Crisanti's motion to suppress.

"When an appellate court reviews a trial court's order concerning a motion to suppress evidence, the appellate court should be guided by three principles with regard to the interpretation of the trial court's judgment of the facts. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge 'hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it.' [Cit.]

"Second, the trial court's decision with regard to 'questions of fact and credibility . . . must be accepted unless clearly erroneous.' [Cit.] . . . Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. [Cit.]" (Emphasis omitted.) *Tate v. State,* 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

Viewed in light of the foregoing principles, the evidence at the suppression hearing showed that on the day of the events leading to his arrest, Crisanti and two companions, Dubnoff and Rivera, purchased airline tickets for a flight from Brunswick, Georgia, to San

Francisco, with a layover in Atlanta. As the three men passed through security at the Brunswick airport, airline employees noticed one of the men carrying an electronic device in a briefcase. The man carrying the briefcase explained that it was used for carrying jewelry and contained an alarm that could be operated by a remote control. In a separate carry-on bag belonging to one of the other men, an airline employee found a fossil, a large sum of currency and a jar of white powder, which its owner said was powdered caffeine. Crisanti's bags were also searched in the regular pre-boarding process.

The minimally trained employees assumed the electronic device in the briefcase was legal and permitted the men to board the plane with the briefcase and the bag containing the jar and currency. Upon reflection, the employees became suspicious about the briefcase and items in the other bag and contacted flight control at the Atlanta airport. They informed flight control about the electronic device in the briefcase, relating that it had a remote control and cautioning that "it could be a danger."

In Atlanta, flight control advised the Atlanta Police Department of the situation. Approximately eight Atlanta police officers, accompanied by several bomb dogs, were joined at the airport by six agents from the Drug Enforcement Administration Airport Task Force ("DEA"). Approximately ten to fifteen minutes elapsed between the time the officers and agents assembled on the airport tarmac and the arrival of the flight. During this time, they were briefed concerning the situation.

When the men exited the plane onto the tarmac, Crisanti and Dubnoff had small carry-on bags with them, and Rivera was carrying the briefcase. DEA Agent Stevens, accompanied by Agent Roey, approached Crisanti, identified himself as a police officer and directed Crisanti to put down the bag he was carrying. Agent Stevens told Crisanti they had received information concerning an electronic device with a remote control in a briefcase and asked Crisanti to keep his hands out of his pockets. Crisanti told Agent Stevens they indeed had such a briefcase that could emit an electric shock and could be activated by remote control. He explained to Agent Stevens that he and his companions were in the jewelry business and on a trip to purchase jewelry in San Francisco. The briefcase, he said, was a security device used to carry valuable jewels but was not activated. They were also carrying large amounts of cash because they could get better deals for jewelry if they paid with cash, he further explained. After Crisanti told the agents he did not know the location of the remote control, Agent Roey patted him down in an attempt to locate it. Agent Roey did not find the remote control, but she found $5,000 in Crisanti's pants pocket and another $5,000 in his coat pocket. Although Crisanti offered several times to open the briefcase for the

agents, they did not allow him to do so because they were concerned that the briefcase could be activated by remote control and that it might contain explosives.

As Agents Stevens and Roey were questioning Crisanti, Agent Webster approached Rivera, who was carrying the briefcase, advised him he was a police officer, and told him to put the briefcase down because he "wanted to get that briefcase out of his hands and try and locate a remote control device. . . ." Webster advised Rivera that he was being detained for further investigation to determine whether the "briefcase was an explosive device or would, in fact, deliver a substantial shock." Webster conducted a pat-down of Rivera in search of the remote control, felt a rectangular object in Rivera's breast pocket which turned out to be a stack of currency, and handcuffed Rivera until he could get him secured at the Atlanta Police Department's airport precinct. Another officer searched Dubnoff and found in his pocket what appeared to be a crack pipe with residue. Dubnoff was placed under arrest for possession of cocaine and placed in handcuffs. Along with Rivera and Dubnoff, the officers took Crisanti to the airport police department to further search for the remote control.

When they arrived at the police department, Agent Stevens put Crisanti into an office with two other officers and retrieved Crisanti's carry-on bag. Agent Stevens testified that he then asked Crisanti for consent to search his bag and that Crisanti gave his consent. Inside the bag, Agent Stevens found a pair of digital electronic scales with a white powdery substance on them, a woman's makeup compact with white powder in it, and a prescription bottle two-thirds full of white powder. One of the officers eventually opened the briefcase where he found the remote control.

Prior to trial, Crisanti moved the court to suppress evidence of the currency found during the pat-down and the items found in his carry-on bag. The trial court denied Crisanti's motion as to the currency because it was found during a legal investigatory stop while the officers were attempting to locate the remote control. However, the trial court found that the search of Crisanti's bag was conducted after he was arrested without probable cause and suppressed evidence of the bag's contents at trial.

We reverse for two reasons. First, the trial court failed to consider the reasonableness of the police officers' actions from their perspective at the time of the incident. *Williams v. State*, 193 Ga. App. 630, 631 (1) (388 SE2d 884) (1989). Second, the trial court failed to recognize uncontradicted testimony that Crisanti gave Agent Stevens his consent to search the carry-on bag and the briefcase before he or his traveling companions were removed from the tarmac.

In this age of international terrorism, this Court and the federal courts have held that an individual such as Crisanti who enters an

airport security area may be searched even on a " 'mere suspicion of possible illegal activity.' " *McSweeney v. State*, 183 Ga. App. 1, 2 (1), 3 (358 SE2d 465) (1987); *United States v. Lopez-Pages*, 767 F2d 776, 778 (11th Cir. 1985). That permission to search did not end when Crisanti successfully cleared the x-ray devices and magnetometers in Brunswick. Crisanti was headed for another plane when he arrived in Atlanta. "The search may continue until the law enforcement official satisfies himself that no harm would come from the passenger's boarding the plane. To be effective, the security efforts must focus not on a single . . . tangible item, but on the suspect himself, his demeanor and possessions during the entire course of his airport presence." *United States v. Cyzewski*, 484 F2d 509, 513 (5th Cir. 1973); see also *United States v. Legato*, 480 F2d 408, 411-412 (5th Cir. 1973). Likewise, in *McSweeney*, supra at 3-4, this Court held that once consent is given to search it cannot be withdrawn after detection devices indicate danger to flight security.

Crisanti admitted to Agent Stevens the electronic device could emit a shock and could be activated by remote control. Were the officers required by the law to cease and desist from taking any further action and instead to allow Crisanti to proceed to the plane scheduled to cross the country? No. The officers were justified in searching the bags and double-checking the search done in Brunswick to find the remote which might activate this potential weapon.

This Court noted nearly a decade ago the importance of allowing airport security to search for any device "which can be used to intimidate and coerce an air crew. . . ." *McSweeney*, supra at 2 (1). To ensure passengers do not carry such devices on aircraft, "[a]dditional searches outside the perimeter of the security area are permissible if, in the exercise of their professional judgment, the authorities' reasonable suspicions have not been allayed by the routine security check." (Citations and punctuation omitted.) *Lopez-Pages*, supra at 778; *McSweeney*, supra at 4. Because Brunswick's security agents believed they were not equipped or trained to do an adequate screening for potential weapons, it was reasonable for officers in Atlanta to conduct an additional search of Crisanti's bag to secure a remote device which he admitted could activate an electrical shock mechanism in the briefcase.

1. The trial court found that this investigatory detention became unreasonable when the officers removed Crisanti from the concourse to the airport precinct. In *United States v. Sharpe*, 470 U. S. 675, 686 (105 SC 1568, 84 LE2d 605) (1985), the Supreme Court held that an investigatory detention is reasonable in time and scope when the evidence shows police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." In making that determination, it stated, courts should consider whether police

are acting in a swiftly developing situation and, if so, "should not indulge in unrealistic second-guessing." Id. Another key factor is whether police acted unreasonably by failing to recognize or pursue an available alternative. Id. at 687.

This case bears little resemblance to *Florida v. Royer*, 460 U. S. 491 (103 SC 1319, 75 LE2d 229) (1983), upon which Crisanti relied in his motion to suppress. That case involved an airport search for drugs based solely on the characteristics of the suspect. In this case, the police officers were searching for a device which Crisanti admitted was present and which he acknowledged could emit an electrical shock. In other words, this device was a potential weapon that posed a direct threat to airline passengers and crew, or to people in the airport if activated before the men left for San Francisco. The Supreme Court and this Court have held that once a person who is the subject of an investigatory stop admits a weapon is present, officers are privileged to search the area to uncover that weapon. *Michigan v. Long*, 463 U. S. 1032, 1048 (103 SC 3469, 77 LE2d 1201) (1983); *Bentley v. State*, 214 Ga. App. 580, 582 (3), 583 (448 SE2d 479) (1994). The reasonableness of a *Terry* seizure "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U. S. 873, 878 (95 SC 2574, 45 LE2d 607) (1975) (citing *Terry v. Ohio*, 392 U. S. 1, 20-21 (88 SC 1868, 20 LE2d 889) (1968)).

In assessing the detention of Crisanti, his associates, and their luggage, the court must " 'consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.' " *Mallarino v. State*, 190 Ga. App. 398, 400 (2), 401 (379 SE2d 210) (1989). To reasonably carry out their investigation, these officers had to carefully and cautiously search until they found this remote device.

The officers' methods used to conduct this search were reasonable under the circumstances. It is problematic to criticize the officers for not believing Crisanti's explanations and for not opening the briefcase on the tarmac; Agent Stevens and Agent Webster both testified they were afraid of the device despite the suspects' assurances. These officers were not required to believe Crisanti and his traveling companions, one of whom they had arrested for drug possession; neither were they required to endanger themselves and the public, either in Atlanta or aboard a plane by opening a briefcase whose design they associated with weaponry. *Legato*, supra at 412. Judges who are untrained in law enforcement, who are not present as the incident unfolds, and who have the benefits of hindsight and reflection should be hard-pressed to "second-guess" the decision of these officers not to open the briefcase in public without knowing the location of its re-

mote control. Although bomb dogs were present, they would have been no help in dispelling the officers' fears; Crisanti himself stated the briefcase could *shock* its holder, not explode in his or her hands. Unlike *Royer*, supra at 505, in which the evidence showed the police could have used less intrusive means such as drug dogs to detect contraband, the only alternative available to these officers was to open the briefcase and assume the risk of injury. "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Cady v. Dombrowski*, 413 U. S. 433, 447 (93 SC 2523, 37 LE2d 706) (1973). Unlike the officers in *Royer* who made no effort to allay their suspicions before hauling the suspect into a small room, these officers made a reasonable but fruitless search on the tarmac.

Under these circumstances, we do not declare the search legally invalid because the officers removed Crisanti and their investigation to the airport precinct, out of the cold and away from the prying eyes of the public. In fact, their action could be characterized as "minimizing" the intrusiveness of the search and the embarrassment to the passenger. *Lopez-Pages*, supra at 779. Safety concerns justified removing the briefcase and Crisanti away from the public to protect the passersby on Concourse D from any harm which might be caused by this unusual device. See *Royer*, 460 U. S. at 504-505, in which the Supreme Court acknowledged safety reasons would justify moving a suspect from an airport concourse to a more private area.

Furthermore, these officers were "act[ing] diligently in a situation they did not necessarily expect to happen." *State v. Grant*, 195 Ga. App. 859, 862 (3), 864 (394 SE2d 916) (1990). As soon as the agents frisked Dubnoff, Crisanti's fellow traveler, they arrested him for drug possession and had to secure him somewhere. Because Crisanti was with him, and the agents needed to check all three men's luggage for the remote device, it made sense to take them all to the airport precinct. Any delay in the officers' search resulted not from neglect on their part, but rather from the actions of Crisanti and his associates, and these short delays were therefore necessary to the officers' legitimate investigation. *Sharpe*, supra, 470 U. S. at 687 (distinguishing *Royer*). These officers were acting in a "swiftly-developing situation," and we will not facilely condemn the choices they made. *Williams*, supra at 631 (1). Reasonableness is measured by the "foresight of the policeman on the scene who must act in the public interest in a very short space of time." Id.; see *Brooker v. State*, 164 Ga. App. 775 (1), 776 (298 SE2d 48) (1982).

Construing the evidence in favor of the trial court's findings, the investigatory detention in this case did not contravene the law. The officers were not pursuing some possible violation of drug laws, as in *Royer*. They were searching for an admittedly dangerous device, and

their job was complicated by their unfamiliarity with the device, the unusual explanations of three men regarding its purpose and their mission, and the arrest of one of the men on drug charges. Because Crisanti was reasonably detained at the time he gave Agent Stevens his consent to search at the precinct, that search was valid. See *Royer*, supra at 502, holding that if Royer had given his consent to search while he was justifiably being detained on reasonable suspicion, the products of his search would have been admissible against him.

2. The trial court found proper the brief detention on the tarmac but did not address the consent to search Crisanti gave at that time. The evidence reflects, without contradiction, that Agent Stevens approached Crisanti as he came down the ramp and identified himself as a police officer. He explained to Crisanti his concern about the briefcase. Crisanti acknowledged the case had a remote control device and could deliver an electrical shock, but Crisanti said he did not know where the remote was. Agent Stevens asked if he could search the briefcase and his carry-on luggage, and Crisanti replied, "no problem," relating that it had been searched when he boarded the plane in Brunswick. Agent Stevens did not display a weapon to Crisanti, although at some point Agent Webster pulled his weapon on Crisanti's companion who was carrying the briefcase.

The trial court made findings of fact, but it made no mention of Agent Stevens' testimony showing Crisanti gave his consent to search on the concourse. This testimony was not contradicted by the testimony of Agent Roey, who overheard much of the conversation between Agent Stevens and Crisanti; when asked whether she heard Agent Stevens ask Crisanti for his consent on the tarmac, Roey replied, "At this time I can't remember exactly what he asked him out on the ramp. . . . I honestly can't say." This neutral testimony provides no contradiction to Agent Stevens' positive testimony that he asked for and received Crisanti's permission to search during the initial investigatory stop at Concourse D. *Wallace v. Lessard*, 158 Ga. App. 772 (1), 773 (282 SE2d 153) (1981). The trial court was required to consider this testimony, as "a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence" to the contrary. *Miley v. Fireman's Fund Ins. Co.*, 176 Ga. App. 527, 528 (336 SE2d 583) (1985); OCGA § 24-4-7. When controlling facts are undisputed, our review of a motion to suppress is de novo. *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994); *Newsome v. State*, 192 Ga. App. 846 (1) (386 SE2d 887) (1989).

From this evidence, it appears the search of Crisanti's carry-on bag resulted from a voluntarily given consent and not from the later detention which the trial court characterized as illegal. *Miranda v. State*, 189 Ga. App. 218, 221 (375 SE2d 295) (1988). Verbal agree-

ment is probative evidence of consent, *Lopez-Pages*, supra at 780, and the testimony showed Crisanti agreed to the search on the tarmac just as he had agreed to it in Brunswick. The authorities cited above also show that once Crisanti presented himself at airport security in Brunswick and allowed agents to search his carry-on bag, he could not withdraw that consent until authorities were satisfied he posed no security risk. *McSweeney*, supra at 3-4.

The transcript of the suppression hearing shows independently that, at the time he originally gave his consent, Crisanti "was not subjected to any duress or coercion, and that he freely, voluntarily and intelligently consented to the search of his [carry-on bag]. . . . [Cit.]" (Punctuation omitted.) *Calixte v. State*, 197 Ga. App. 723, 725-726 (2) (399 SE2d 490) (1990).

*Judgment reversed. McMurray, P. J., Birdsong, P. J., Andrews and Johnson, JJ., concur. Pope, P. J., Blackburn, Smith and Ruffin, JJ., dissent.*

RUFFIN, Judge, dissenting.

The majority correctly sets forth the principles under which we are required to review a trial court's ruling on a motion to suppress. "On numerous occasions the appellate courts of this state have invoked these . . . principles to affirm trial court rulings that upheld the validity of seizures. These same principles of law apply equally to trial court rulings that are in favor of the defendant and their application to this trial court's order would demand that the court's order be affirmed." *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994). Therefore, I must respectfully dissent.

While I agree with the majority that the agents were entitled to stop Crisanti and his companions in order to determine the nature of the briefcase, I do not agree that the time and scope of their investigative detention was sufficiently limited. Because the record shows that there was at least some evidence to support the trial court's judgment, it was not clearly erroneous.

In addition to the facts set forth in the majority's opinion, I believe it is essential to point out that the record shows, without contradiction, that the agents admitted they had no evidence that Crisanti had broken any laws when they took him to the police department to further search for the remote control. Furthermore, although the record shows that Rivera was carrying the briefcase, at no time did anyone ask him if he also had the remote control. Likewise, although bomb dogs were present, the officers did not conduct a canine sniff of the briefcase or other luggage to confirm or dispel their suspicion that the briefcase contained explosives. Finally, Agent Webster, who was in charge of the investigation, acknowledged that from the time he first secured the briefcase on the airport tarmac, to the time it was

opened at the police department, no efforts were made to confirm his suspicion that it might explode or deliver a shock.

In *McSweeney v. State*, 183 Ga. App. 1, 2 (1) (358 SE2d 465) (1987), we recognized that the dangers associated with air piracy justify the need for stringent security measures at airports. Such concerns justify, for example, airport security searches of all passengers and their luggage based on the need to protect an aircraft and its passengers. Id. at 3. However, the scope of an airport search is not unlimited and like other searches and seizures must be carefully tailored to its initial justification. See generally *Florida v. Royer*, 460 U. S. 491 (103 SC 1319, 75 LE2d 229) (1983). We have thus held that "in cases involving the detention of luggage, a two-fold inquiry is in order: (1) Did the police have reasonable cause to detain the luggage? [and] (2) Was the detention so minimally intrusive as to be justifiable upon reasonable cause? [Cit.]" *State v. Foster*, 209 Ga. App. 143, 146 (433 SE2d 109) (1993). To be minimally intrusive, such a detention, whether of a passenger or his luggage "must be temporary and last *no longer than is necessary to effectuate the purpose of the stop.* Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a *short period of time.* [Cits.]" (Emphasis supplied.) *Royer*, supra at 500.

I agree with the majority and the State that the officers' initial seizure of Crisanti and his carry-on bag was based on a reasonable, articulable suspicion that his companion was carrying a briefcase that might contain explosives and that the briefcase could be detonated by a remote control Crisanti may have possessed. However, while it is likely that the officers' suspicions could have been confirmed or dispelled on the tarmac, without further detaining Crisanti, they instead chose to take him to the police department for a further search. Although the officers justified their search based on their suspicions that the briefcase could deliver a shock or that it contained explosives, they did *nothing* from the time they first secured the briefcase on the airport tarmac, to the time it was opened at the police department, to dispel their suspicions even though bomb dogs were present and x-ray devices at airport security stops were presumably available. See id. at 505-506. Although the majority states that the bomb dogs would have been of no use, the record clearly shows that the agents were suspicious that the briefcase contained explosives. The bomb dogs could have helped dispel this suspicion. Likewise, even though the officers were suspicious that either Crisanti or one of his companions possessed the remote control, they failed to ask Rivera, who possessed the briefcase, whether he also possessed the remote control. In light of the officers' failure to take even obvious and available measures to dispel their suspicions, I also find questionable their refusal

to allow Crisanti to open the briefcase when he repeatedly offered to do so. If the agents were concerned that the briefcase could emit a shock, then allowing Crisanti to open it would have allowed them to confirm or dispel this suspicion without endangering their safety. In short, while the officers could have quelled their suspicions concerning the briefcase and the remote control without further delaying Crisanti, they chose instead to detain him for further investigation at the police department. "[T]he detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." Id. at 502. "What had begun as a [permissible] inquiry in a public place had escalated into an investigatory procedure in a police [station], where the police, unsatisfied with previous explanations, sought to confirm their suspicions. The officers had . . . seized [Crisanti's] luggage. [Crisanti] was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained. . . . As a practical matter, [Crisanti] was under arrest." Id. at 503. It is thus clear that the suppressed evidence was not obtained during a lawful investigative search.

I also find that because the officers did not have probable cause to arrest Crisanti, his subsequent consent to search the bag was tainted. All the officers knew at the time of Crisanti's arrest was that his companion possessed a briefcase containing an electronic device which had a remote control and that "it could be a danger." The officers, unsatisfied with Crisanti's explanation that the briefcase was a security device, sought to further detain him and his baggage. Because I agree with the trial court that these facts did not provide probable cause to arrest Crisanti, and further find that his consent to search the bag was tainted by the illegality and was ineffective to justify the search, the judgment of the trial court should be affirmed. See id. at 507-508.

Furthermore, although the majority finds the trial court ignored undisputed testimony that Crisanti consented to a search while on the tarmac, the record does not support this finding, and in any event, even if Crisanti did consent at that time, the agents failed to act upon it in an expeditious manner.

The evidence showed that Agent Roey was present and heard the conversation between Agent Stevens and Crisanti. From her testimony on direct examination, it is apparent that Agent Roey recalled the details of the conversation, including the fact that Crisanti consented to a search of his bag *after* they reached police headquarters. Yet, when asked on cross-examination whether Agent Stevens asked Crisanti for consent to search his bag while on the tarmac, Agent Roey testified that she could not "remember exactly what he asked him out on the [tarmac]." "Credibility of witnesses and the weight to

be given their testimony is a decision-making power that lies solely with the trier of fact. The trier of fact is not obligated to believe a witness *even if the testimony is uncontradicted* and may accept or *reject any portion* of the testimony. [Cit.]" (Emphasis supplied.) *Tate*, supra at 56 (3).

The trial court heard both Agent Roey's and Agent Stevens' testimony and had the opportunity to observe their demeanor. The trial court must have concluded that because Agent Roey heard and recalled, with detail, the conversation on the tarmac, yet did not remember anything regarding consent being mentioned, that no such consent was given at that time. Such a conclusion is consistent with the trial court's final order granting the motion and is also "consistent with the way reviewing courts interpret judicial orders." Id. at 57. Moreover, even if Agent Stevens' testimony concerning consent was uncontradicted, the trial court *was authorized to reject it*. See id.

Furthermore, it was the State's burden to show that any consent was freely and voluntarily given under the surrounding circumstances. *Mallarino v. State*, 190 Ga. App. 398, 400, 402 (2) (379 SE2d 210) (1989). The circumstances of this case provided at least some evidence from which the trial court could have concluded that any consent allegedly given on the tarmac was coerced. The evidence is undisputed that Crisanti was confronted by a force of approximately 14 law enforcement officers accompanied by bomb dogs. Although the agents interrogating Crisanti did not use their weapons, one of the agents had pointed a gun at his companion. There was no evidence that Crisanti was advised of his relevant constitutional rights including his right to refuse to consent. Although no single factor is controlling, this is some evidence that the psychological impact of the circumstances surrounding the detention, accompanied by the failure to advise him of his rights, could have led Crisanti to believe that he had no choice but to consent. See id.; *Love v. State*, 144 Ga. App. 728 (2) (b) (242 SE2d 278) (1978), overruled on other grounds, *Parker v. State*, 161 Ga. App. 37 (288 SE2d 852) (1982). See also LaFave, Search & Seizure (2d ed. 1987), Vol. 3, § 8.2 (b).

I do not find under these circumstances that the trial court's order was clearly erroneous. Id.

Finally, the majority believes that the officers' actions in removing Crisanti from the tarmac to police headquarters were justified for safety reasons and because such actions minimized the intrusiveness of the search. However, as the majority recognizes, the officers moved Crisanti to the police headquarters to get out of the cold and away from the prying eyes of the public. With all due respect, I do not see how getting out of the cold is related to safety. Neither do I believe that the agents' search of Crisanti's carry-on bag necessitated his removal to police headquarters. Crisanti had already been stopped by a

large number of officers accompanied by bomb dogs, questioned and patted down, all in full view of the public. If indeed Crisanti consented to a search of his small carry-on bag while on the tarmac, the search could have been conducted on the spot without any more of a public intrusion on his personal liberty than had already taken place. Moreover, as the Supreme Court noted in *Royer,* if the on-the-spot "search proved negative, [Crisanti] would have been free to go much earlier and with less likelihood of missing his flight, which in itself can be a very serious matter in a variety of circumstances." *Royer*, supra at 505. A positive result, on the other hand, "would have resulted in his justifiable arrest on probable cause." Id. at 506.

I am authorized to state that Presiding Judge Pope, Judge Blackburn and Judge Smith join in this dissent.

DECIDED MARCH 15, 1996.

*Robert E. Keller, District Attorney, Albert B. Collier, Assistant District Attorney*, for appellant.

*Melnick, Moore & Elliott, Larry M. Melnick*, for appellee.